UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

THOMAS JEFFERY GRANTHAM, JR.,

     Plaintiff,

v.                                                                   Case No. 3:15cv48/CJK

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration,

     Defendant.

_____/

<u>MEMORANDUM ORDER</u>

This case is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Thomas Jeffery Grantham, Jr.'s applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34, and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83.  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and FEDERAL RULE OF CIVIL PROCEDURE 73 for all proceedings in this case, including entry of final judgment.  Upon review of the record before this court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, will be affirmed and both applications for benefits will be denied.

## ISSUE ON REVIEW

Mr. Grantham, who will be referred to as claimant, plaintiff, or by name, raises one issue on appeal, arguing the ALJ erred in giving little weight to the opinion of a treating psychiatrist, Dr. Ratko Sarazin.

## PROCEDURAL HISTORY

Claimant filed his application for DIB on October 25, 2011 and for SSI on October 24, 2011, alleging disability beginning on July 17, 2011.  T. 205-14.[1] Plaintiff's claims were denied initially and on reconsideration.  T. 120-44.  After filing a request for a hearing, claimant appeared before an Administrative Law Judge ("ALJ") on June 3, 2013.  T. 28-57, 145-46.  On November 15, 2013, the ALJ issued a decision denying plaintiff's claims for benefits.  T. 9-27.  Claimant petitioned the Appeals Council for review of the ALJ's decision.  T. 7.  The Appeals Council denied claimant's request; as a result, the ALJ's decision became the final determination of the Commissioner.  T. 1-5.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not

---

[1] The administrative record, as filed by the Commissioner, consists of 10 volumes (docs. 7-1 through 7-10) and has 564 consecutively numbered pages.  References to the record will be by "T.," for transcript, followed by the page number.

applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, re-weigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d. 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla.

Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[2]

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do his previous work, "but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. §§ 404.1520(a)-(g) and 416.920(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.[3]

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates claimant's residual functional capacity and vocational factors, he is not disabled.

"[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[4]   20 C.F.R. §§ 404.1545(1) and 416.945(1).  The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective

---

[3] Claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir.  1986).

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence.  In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).)  We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations.  (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

Case. No. 3:15cv48/CJK

complaints.  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[5] Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by the disappointed claimant.

## FINDINGS OF THE ALJ

In his written decision, the ALJ made a number of findings relative to the issue raised in this appeal:

• "The claimant meets the insured status requirements of the Social Security Act through June 30, 2015."  T. 14.

• "The claimant has not engaged in substantial gainful activity since July 17, 2011, the alleged onset date. (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)."  T. 14.

• "The claimant has the following severe impairments: diabetes mellitus, hypertension, pseudo-seizures, major depressive disorder, and personality disorder (20 CFR 404.1520(c) and 416.920(c))."  T. 14.

• "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."  T. 15.

• "[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: He

_____

[5] "Before we go from step three to step four, we assess your residual functional capacity.  (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

is precluded from climbing ladders, ropes, or scaffolds.  He is to have no work at unprotected heights and is not to operate motorized equipment or work near open water.  He is limited to the simple routine tasks of unskilled work that require few work place decisions and has few changes in work settings.  He can interact with coworkers and supervisors on a basic level but needs to work in a well-spaced work area to reduce interpersonal interactions.  He should have only casual occasional contact with the general public."  T. 17.

• "The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965)."  T. 21.

• "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))."  T. 22.

• "The claimant has not been under a disability, as defined in the Social Security Act, from July 17, 2011, through the date of th[e] decision  (20 CFR 404.1520(g) and 416.920(g))."  T. 22.

## FACT BACKGROUND[6]

According to plaintiff's testimony at the hearing, he was thirty-eight years old and married at the time the ALJ rendered his decision.  T. 37.  He has a limited education, never having graduated from high school, and past relevant work as a fast

---

[6] The medical and historical facts of this case, as set out below, were derived from plaintiff's testimony at the hearing as well as the administrative record.  Because only one medical provider's opinion is at issue, the undersigned need not address the medical records or opinions of other providers.  Finally, although intended to be thorough and to provide an overview of claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

Case. No. 3:15cv48/CJK

food manager, van driver, and merchandise deliverer.  T. 37-38.  When asked by the ALJ about the problems he would have going back to work as a van driver, plaintiff responded the employer would not hire him back.  T. 43.  After the ALJ clarified he was asking about problems that would prevent claimant from being able to perform that type of work, claimant responded "[m]e seeing stuff and my vision is not that good, and also I can't take criticism from anybody.  If I do I get mad.  That's the reason I quit."  T. 43.  When asked about his ability to perform household chores, plaintiff testified he does laundry but his back hurts when he stoops down for a long period of time; he also said when he does "a lot of things," such as washing dishes, vacuuming, or changing a tire, he must "sit down and rest and get back up, go back and sit down."  T. 43, 49.  Plaintiff has low back pain every other day and rests for "[a]bout three or four hours" during the day due to the pain.  T. 50.  He said, however, he was receiving no treatment for the back condition.  T. 44.

Plaintiff also recounted he has had memory problems "for about ten years" and the problems "mostly get[] bad this time when [he] work[s] with people and stuff and they start yelling and talking and screaming and stuff."  T. 49.  When that happens, he will "quit and walk out."  T. 49.  Plaintiff acknowledged that at times he has difficulty with authority figures and does not "want to listen to them."  T. 50.  He reports he has been hearing voices and having visual hallucinations since approximately September 2012, and that "the voice tells [him] not to listen to [authority figures]."  T. 44-45, 50.  When asked about his mental health therapist, plaintiff testified he saw a nurse practitioner every one to three months and did not participate in therapy sessions in between visits.  T. 44.  According to plaintiff, although he is on medication, he "still see[s] stuff and hear[s] people and stuff a lot,

but not like [he] used to." T. 44-45.

The ALJ asked about the frequency of the audio and visual hallucinations, and plaintiff stated it varied and "[i]t might take a week, two weeks before I hear anything or see something.  Then I could see and hear things every day for three or four days and then it will go away." T. 45.  The voices also told plaintiff to "cut [his] arm up . . . real bad," something he has done "about ten times." T. 46.  Before he started hearing voices and having visions, plaintiff suffered from "major depression" for which he was prescribed Prozac, which "helped a whole lot." T. 48.  Plaintiff testified he "can't be around a bunch of people, crowds or anything like that" because he "just can't deal with them" and has to "walk away." T. 48-49.

Plaintiff is an insulin-dependent diabetic, having been diagnosed in approximately January 2012. T. 51-52.  He also has blurry vision. T. 51.  He has glasses, but does not wear them. T. 51-52.  Plaintiff attends church regularly, "[e]very Sunday and every Wednesday," unless he oversleeps. T. 46.  On Sundays, plaintiff attends both Sunday school and the church service. T. 46.  Wednesday nights consist primarily of a Bible Study. T. 46-47.  Plaintiff has a driver's license and drives alone. T. 47.  He grocery shops, but "can't walk a lot because [his] back starts hurting." T. 47.

A vocational expert, Leslie Gillespie, also testified at the hearing.  Ms. Gillespie testified plaintiff has past relevant work as a fast food services manager, which is skilled work preformed at the light exertional level; van driver, which is semiskilled work performed at the light exertional level; and merchandise deliverer, unskilled work performed at the medium exertional level. T. 53.  The ALJ asked the vocational expert to assume an individual the same age and education and with the

same past work experience as plaintiff, who cannot climb ladders, ropes or scaffolding; work at unprotected heights; drive motorized equipment; work near open water; is limited to the simple, routine tasks of unskilled work that requires few workplace decisions and ordinarily has few changes in the work setting; has only casual and infrequent interaction with the general public; and has basic interaction with coworkers and supervisors but in a well spaced environment so there is not a lot of interpersonal interaction during the work day.  T. 54.  The ALJ then asked the vocational expert whether such an individual would be able to perform any of claimant's past relevant work.  T. 54.  The vocational expert responded that because of the combination of skill factors and limitation on driving, such an individual would not be able to perform any of plaintiff's past work.  T. 54.

When asked whether there would be any jobs such an individual could perform, the ALJ responded that with only non-exertional limitations, as imposed upon plaintiff, such an individual could perform jobs such as hand packager, laundry worker, and cleaner, all of which are unskilled medium work.  T. 55.  If such an individual were to have problems staying on task and maintaining concentration for two-hour periods without being off task ten percent of the time, according to the vocational expert, he might be able to get one of the specified jobs but would not be able to retain it.  T. 55.  If such an individual were able to stay on task and maintain concentration but were to have good days and bad days such that he would be expected to miss three or more days of work per month, he would not be able to retain employment in the unskilled work referenced by the ALJ.  T. 56.  If such an individual were able to stay on task and maintain concentration but, as a result of a personality disorder, would most likely express his emotions toward his coworkers,

resulting in strained interpersonal relationships with coworkers more than fifty percent of the time, and could not take criticism well, resulting in strained interpersonal relationships with supervisors at least fifty percent of the time, he would not be able to maintain a job.  T. 56-57.  Based at least in part on the vocational expert's testimony, the ALJ found plaintiff capable of performing work that exists in the national economy.

Although the ALJ found that plaintiff suffers from a number of severe impairments, only plaintiff's mental impairments are at issue in this appeal.  As set forth above, plaintiff challenges the ALJ's decision to give little weight to the opinion of his treating psychiatrist, Dr. Sarazin, who testified during his deposition that he expected plaintiff to have "marked and extreme difficulties" dealing with co-workers and supervisors and to miss at least four days of work per month and, consequently, that plaintiff was disabled from regular full-time and continuous work.  T. 491.  Dr. Sarazin is a psychiatrist at Lakeview Center, Inc. ("Lakeview"), where plaintiff received mental health treatment beginning in February 2012.  T. 333-64, 482-94. Nevertheless, with one or two exceptions, Erik Sternung, a registered nurse practitioner, actually saw and examined plaintiff during his visits to Lakeview.  T. 333-64.

On February 22, 2012, Nurse Sternung diagnosed plaintiff with "Major Depressive Disorder" and prescribed Prozac.  T. 341.  Plaintiff missed his next appointment, scheduled for March 20, 2012.  T. 343.  Plaintiff made it to his appointment on March 28 and informed Nurse Sternung that he had been admitted to the hospital for seizure-like activity.  T. 344.  A psychiatrist on call at the hospital recommended increasing plaintiff's medication because plaintiff was having some

breakthrough depression, anxiety, and possibly "pseudoseizures." T. 344. Plaintiff's mood was good during the March 28 visit, his affect was normal, and he had a good range of expression and fair insight and judgment. T. 344. Nurse Sternung increased plaintiff's Prozac dosage, as recommended, "[i]n order to better address his symptoms." T. 344.

Plaintiff appeared for a June 28 appointment "but started seizing in the lobby" and was transported to West Florida Hospital for follow-up. T. 346. During an August 2, 2012, visit to Lakeview, claimant reported doing "fairly well" since his last appointment, but he was still having some breakthrough depression, agitation, and irritability. T. 347. His mood was "okay," his affect was flat with limited range of expression, and his insight and judgment were fair. T. 347. He was continued on his current medication and scheduled to return in three months. T. 347. During an October 31 visit, claimant reported he had cut himself the prior month and was having auditory and visual hallucinations, along with increased depression. T. 349. He also indicated he did not believe the psychiatric medication was working as well as it had in the past. T. 349. Once again, his mood was" okay", his affect was flat with limited range of expression, and his insight and judgment were fair. T. 349. Nurse Sternung adjusted the medication and advised plaintiff to return in two to three months. T. 349. Claimant's next appointment was November 29, 2012. T. 351. Claimant reported still hearing voices commanding him to cut himself, which he did two days before this appointment. T. 351. He said the medication had "helped a little" but not as much as when he first started it and he often was agitated and irritable. T. 351. He indicated he was depressed, and he had a flat affect with a limited range of expression and fair insight and judgment. T. 351. Plaintiff declined inpatient treatment but

agreed to an increase in medication.  T. 351.

During a December 5, 2012, visit, claimant indicated the new medication regimen improved his symptoms, and his moods were better with less depression.  T. 353.  He was still experiencing "command hallucinations" to cut himself, but the voices were less often and intense and he had not complied with them.  T. 353.  He was "more bright and animated," had "been able to do more things around the house," and reported he was doing a lot better.  T. 353.  He described his mood as good, and he had a normal affect with good range of expression and fair insight and judgment.  T. 353.  A follow-up appointment was to be scheduled in two to three months.  T. 353.  Later in December, however, claimant presented to Lakeview reporting more self-destructive behavior.  T. 355.  Plaintiff and his wife, who accompanied him, agreed plaintiff would seek medical care for his cut wound and mental health treatment at West Florida Hospital.  T. 355.  Plaintiff's suicide risk was determined to be moderate because he did not seem to be in immediate danger and was cooperative, oriented, and seeking help.  T. 356-59.

During his next visit with Nurse Sternung, on January 16, 2013, plaintiff reported an "acute psychiatric admission" to Bridgeway in Ft. Walton after self-harming thoughts and behavior.  His medication had been increased, which alleviated the voices, hallucinations, and self-harming thoughts.  T. 360.  His mood was good, his affect was normal with good range of expression, and he had fair insight and judgment.  T. 360.  Both he and his wife reported he was stable and doing well at home.  T. 360.  Claimant was continued on his medication and scheduled to return in two to four weeks.  T. 360-61.  On February 14, 2013, claimant reported being off his medication for a couple of weeks because of confusion with the pharmacy and a refill

request.  T. 362.  Plaintiff had increased depression, hallucinations, and suicidal thoughts and was more withdrawn.  T. 362.  He conveyed his most recent medication, Risperdal, had been the most effective but he had trouble with medication compliance, particularly when he was prescribed multiple dosages throughout the day.  T. 362.  He described his mood as "up and down," and he had fair insight and judgment.  T. 362.  Nurse Sternung started plaintiff on a longer acting medication and advised him to return in two to three weeks.  T. 363.  It appears plaintiff's last visit to Lakeview was on March 4, 2013, on which date Nurse Sternung recommended claimant continue with his current medication regimen in order to prevent a relapse of symptoms and return for a follow-up visit in two to three months.  T. 364.

During his deposition, Dr. Sarazin acknowledged that a nurse practitioner treated plaintiff at Lakeview, under Sarazin's supervision.  Dr. Sarazin first met with claimant the week of the deposition "to get better idea into his problems."[7]  T. 485. Dr. Sarazin testified that, based on that meeting, he "found a bit deeper issue, not enough addressed by [his] nurse practitioner, such as Post-Traumatic Stress Disorder and quite possibly seizure disorder affecting his mood disorder and giving psychotic features flavor to all of that."  T. 485.  The doctor stated plaintiff's "[m]ain problem is difficulty focusing and concentrating which can be combination of his medical condition and medication side effects, which has been persistent throughout his life . . . . "  T. 490.  Plaintiff also had chronic anxiety and paranoia, which "cannot be completely eliminated from therapy either."  T. 490.  According to Dr. Sarazin, "these are probably main factors that prevent him to keep stable job because he easily get frustrated around people, feeling that they are about to get him or harm him and other

---

[7] Dr. Sarazin is a native of Croatia.  T. 485.

things related to his paranoia, as well as being very distractful, having difficulties keeping – staying on task." T. 490. Dr. Sarazin testified plaintiff's behavior was "very unpredictable because all of this issues of paranoia, focus and concentrating, and his fear, his tendency to have outbursts of anger and potentially get in trouble because of that in work environment." T. 491. As a result, Dr. Sarazin predicted plaintiff would have "marked and extreme difficulties" dealing with co-workers and supervisors and miss at least four days of work per month. T. 491. Dr. Sarazin further believed plaintiff was disabled from regular full-time and continuous work. T. 491.

The ALJ afforded Dr. Sarazin's opinion little weight – in part because although the ALJ considered him a treating physician, Sarazin "had very little actual contact with the claimant." T. 20. The ALJ also noted "claimant's medical diagnosis of epilepsy appear[ed] to be a factor in the opinion formed by Dr. Sarazin and no indication is given that Dr. Sarazin is aware that the video EEG showed no epileptiform activity during his episodes and the claimant has not been having epileptic seizures as he previously thought." T. 20. "Further," according to the ALJ, "Dr. Sarazin's opinion is not consistent with his own treatment notes as the claimant has consistently been given a GAF score of 57-58 and has no psychiatric hospitalizations and very little treatment."[8] T. 20. Finally, the ALJ found "claimant's

---

[8] The Global Assessment of Functioning Scale, or "GAF," was eliminated from the most recent version of the American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") (5th ed.). Prior to its elimination from the DSM-5, GAF was used primarily by mental health practitioners. The scale provided medical professionals a way to give an opinion numerically, "rat[ing] the occupational, psychological and social functioning of adults." *See Smith v. Comm'r of Soc. Sec.*, No. 6:10-cv-1478-Orl-31KRS, 2011 WL 6217110, at *4 n.1 (M.D. Fla. Nov. 1, 2011). A GAF score between forty-one and fifty indicated severe impairments. *See McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006). A score between fifty-one and sixty indicated moderate difficulties or symptoms in social, occupational, or school functioning. *See Wind v.*
Case No. 3:15cv48/CJK

own allegations and reports . . . indicative of much less limitation in his abilities to function" than assigned by Dr. Sarazin, as "[h]e is able to perform all his activities of daily living with very little limitation," including driving, shopping, regularly attending church, and maintaining a marriage for more than five years.  T. 20.

## ANALYSIS

Claimant contends the ALJ erred in assigning little weight to Dr. Sarazin's opinion, arguing Dr. Sarazin was a treating physician and, absent good cause, his opinion was entitled to considerable or substantial weight.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-61 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  As plaintiff acknowledges, "good cause" exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases).  If a treating physician's opinion as to the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the

---

*Barnhart,* 133 F. App'x 684, 687 n.1 (11th Cir. 2005) (*citing* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000-TR))*.*  Vocational experts found individuals with scores of fifty or lower unable to maintain substantial gainful a2004 ctivity. *See Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (finding a GAF score of fifty reflects a serious limitation on a claimant's ability to perform basic life tasks); *Mook v. Barnhart*, No. 02-2347, 2004 WL 955327, at *6 (D. Kan. April 26, 2004) (noting vocational expert's testimony that claimant's GAF score of fifty would eliminate any possible jobs in the national economy).  The Social Security Administration never endorsed the GAF scale for use in the SSI disability program. *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (noting that GAF score may assist ALJ in formulating residual functional capacity, but is "not essential to the RFC's accuracy"). Case No. 3:15cv48/CJK

ALJ is to give it controlling weight.  *See* 20 C.F.R. § 404.1527(c)(2).  Where a treating physician has merely made conclusory statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical impairments at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).

Opinions on certain issues, such as a claimant's RFC and whether a claimant is disabled, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."  20 C.F.R. § 416.927(d); *see* SSR 96-5p; *Adams v. Comm'r, Soc. Sec. Admin.*, No. 14-11231, 2014 WL 4922215, at *2 (11th Cir. Oct. 2, 2014); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877-78 (11th Cir. 2013); *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986).  Opinions reserved to the Commissioner, even when offered by a treating physician, are not entitled to controlling weight or special significance.  *See* SSR 96-5p.  "Giving controlling weight to such opinions . . . would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."  *Id.*  Although a

physician's opinions about what a claimant can still do or the claimant's restrictions may be relevant, therefore, such opinions are not determinative because the ALJ has the responsibility of assessing the claimant's RFC.  *See* 20 C.F.R. §§ 416.912(b)(2), 416.913(b)(6), 416.927(d)(2), 416.945(a)(3), 416.946(c); SSR 96-5p; *see also Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 486 (11th Cir. 2012) ("A claimant's [RFC] is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter will be considered, it is not dispositive.").

As set forth above, the ALJ gave little weight to Dr. Sarazin's opinion for a number of reasons.  Plaintiff claims the ALJ erred in that regard because the ALJ's decision was based on erroneous facts.  Specifically, plaintiff argues that, contrary to the ALJ's finding, Dr. Sarazin's opinion was not based on an assumption plaintiff suffered from epileptic seizures and that, in his deposition, Dr. Sarazin referred only to plaintiff's "seizure disorder," a condition supported by the record.  Plaintiff also argues the ALJ erroneously concluded he had received no inpatient psychiatric treatment because he was admitted into a receiving facility under the Baker Act in December 2012 for self-mutilation and suicidal ideation and once was taken from Lakeview to the emergency room for treatment due to self-mutilation.  According to plaintiff, an incorrect fact asserted by the ALJ cannot provide a reasonable basis for discrediting Dr. Sarazin's opinion.  Plaintiff further argues GAF scores cannot constitute good cause to limit the weight assigned to a treating physician.

As a threshold matter, and as suggested in the fact summary above, it is not clear from the record that Dr. Sarazin in fact was a treating physician.  *See* 20 C.F.R. §§ 404.1502, 416.902.  Indeed, it appears that, at the time Sarazin rendered the opinions now favored by plaintiff, he had examined plaintiff only once, and that was

in preparation for the deposition in this case.  If Dr. Sarazin was not a treating physician, which seems to be the case, his opinion was not entitled to any deference or special consideration.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (holding that one-time examiners are not treating physicians for purposes of Social Security claims); *Gibson v. Heckler*, 779 F.2d 616, 623 (11th Cir. 1986) (same).

Even assuming, as the ALJ did, Dr. Sarazin was a treating physician, plaintiff's arguments nevertheless fail.  First, contrary to plaintiff's assertion, the ALJ's decision to assign little weight to Dr. Sarazin's opinion was not based on the belief Dr. Sarazin was under the assumption plaintiff suffered from epileptic seizures.  Instead, after noting the scant contact Dr. Sarazin had with claimant, the ALJ stated "claimant's diagnosis of epilepsy *appears* to be a factor in the opinion formed by Dr. Sarazin." T. 20 (emphasis added).  Second, although plaintiff may have been committed under the Baker Act in December 2012 and transferred to the emergency room for psychiatric reasons on another occasion, there is no indication plaintiff was in a psychiatric unit or hospital for treatment purposes in either instance.  In fact, as plaintiff recognizes, when he was committed under the Baker Act, he was held in a receiving facility, not a psychiatric hospital.  Third, the ALJ did not base his decision to assign little credit to Dr. Sarazin's opinion on plaintiff's GAF score.  The ALJ cited the GAF score, along with plaintiff's lack of psychiatric hospitalizations and little psychiatric treatment, in support of his finding that Dr. Sarazin's opinion regarding plaintiff's disability was inconsistent with the Lakeview treatment notes.

Moreover, the ALJ's decision was based on other factors not confronted by plaintiff on this appeal, including the fact that, at the time he rendered his opinion, Dr.

Sarazin had seen plaintiff on only one occasion – the week of his deposition.[9]  T. 20.
The ALJ also cited the fact that claimant's own allegations and reports were
indicative of less functional limitations than imposed by Dr. Sarazin.  T. 20.  For
example, claimant was able to attend church twice weekly and grocery shop,
apparently with no relational difficulties.  In addition, the ALJ had before him the
opinion of David Tessler, Psy. D., who opined in February 2012 that plaintiff is
capable of performing work at all exertional levels so long as he avoids exposure to
hazards, such as machinery and heights, and is limited to unskilled work with simple
instructions and social limitations regarding interaction with coworkers, supervisors,
and the public.  T. 106-15.  Dr. Tessler, who also questioned plaintiff's credibility,
opined plaintiff was able to work despite the diagnosis of minor motor seizures,
personality disorders, and affective disorders and was expected to have mild
difficulties in maintaining social functioning and moderate difficulties in maintaining
concentration, participation, and pace.  T. 106-15.  The ALJ assigned great weight to
Dr. Tessler's opinion, finding it "very credible as a non-treating source," "well-
supported by medically acceptable clinical and laboratory diagnostic techniques," and
"consistent with other substantial evidence in the claimant's case record."[10]  T. 20-21.

---

[9] To the extent Dr. Sarazin opined plaintiff is unable to work, such an opinion pertains to an
issue reserved for the Commissioner and does not constitute a medical opinion entitled to special
deference.  *See* 20 C.F.R. § 416.927(d); SSR 96-5p; *Adams*, 2014 WL 4922215, at *2; *Denomme*
, 518 F. App'x at 877-78; *Bell*, 796 F.2d at 1353-54.

[10] Claimant also had a consultative medical examination on December 6, 2011 by Dr. Richard
Lucey, who offered no opinion as to plaintiff's functional limitations or ability to work, and a
consultative psychiatric examination on December 21, 2011, by Dr. Julie Harper, who concluded
plaintiff "has symptoms of a mixed personality disorder including Borderline Personality Disorder
with rage, difficulty soothing himself, interpersonal relationship problems and
idealization/devaluation problems.  T. 291.  Dr. Harper stated plaintiff "also has narcissistic issues
related to feeling belittled by authority figures" and "gets enraged and then wont' [sic] apologize for

Considering all the evidence of record, particularly the fact that Dr. Sarazin evaluated plaintiff on only one occasion and rendered an opinion inconsistent with other evidence of record, the undersigned finds the ALJ committed no error in assigning little weight to Dr. Sarazin's opinion.

<u>CONCLUSION</u>

For the reasons set forth above, the undersigned finds the Commissioner's decision supported by substantial evidence and application of the proper legal standards.[11] *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

**ACCORDINGLY, it is ORDERED:**

The decision of the Commissioner is AFFIRMED and plaintiff's applications. for Disability Insurance Benefits and Supplemental Security Income are DENIED. The clerk is directed to close the file.

———————————

his behavior." T. 291. She assigned him a GAF score of 58 and opined that while he could be employed despite his personality disorder, he likely would "express his emotions towards his coworkers through strained interpersonal relationships" and "would not take criticism well." T. 291. According to Dr. Harper, plaintiff's prognosis was "expected to be stable at this level." T. 291. The ALJ assigned significant weight to Dr. Harper's opinion, finding it "very credible as a non-treating source," well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "consistent with other substantial evidence in the claimant's case record." T. 19. The ALJ also noted, however, that claimant "had received significant treatment since the evaluation was performed by Dr. Harper." T. 19.

[11] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Case No. 3:15cv48/CJK

**DONE AND ORDERED** this 8th day of December, 2015.

*/s/ Charles J. Kahn, Jr.*
_____

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

Case No. 3:15cv48/CJK